UNITED STATES of America, Appellee,

v.

Doris Jean ADMON, a/k/a Tina Nunn, Tina Caldwell, Appellant.

No. 90–5229.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1991.

Decided July 23, 1991.

Mark W. Peterson, Minneapolis, Minn., for appellant.

Jon M. Hopeman, argued (Jerome G. Arnold, Jon M. Hopeman and Denise D. Reilly, on brief), Minneapolis, Minn., for appellee.

Before FAGG and BEAM, Circuit Judges, and HEANEY, Senior Circuit Judge.

HEANEY, Senior Circuit Judge.

Doris Jean Admon appeals from her convictions of conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, and of traveling in interstate commerce with intent to distribute the proceeds of cocaine sales in violation of 18 U.S.C. § 1952(a). We affirm.

## BACKGROUND

Admon and five others were tried on a thirty-two count indictment charging narcotics and firearms violations in connection with an alleged cocaine distribution conspiracy. Admon is the ex-wife of Ralph ("Plukey") Duke, the convicted ringleader of the conspiracy.

The evidence against Admon at trial consisted of witness testimony, conversations intercepted via a wiretap of Admon's home telephone, and cash, firearms, and drug paraphernalia seized following a search of Admon's home, which she shared with her son, co-defendant Ralph Lamont ("Monte") Nunn. The wiretap evidence showed that Admon made numerous sales of cocaine in amounts of one ounce or less between March 1 and May 2, 1989. It also showed that on March 4, 1989, Duke phoned Admon from Las Vegas and told her to pick up $6,000 from the home of co-defendant Walter Hughes. Admon then phoned Hughes for directions to his house, indicating that she was in a hurry to catch a plane flight. In addition, the wiretap intercepted two other conversations between Admon and Duke on March 4, 1989 in which they discussed Admon bringing money to Duke in Las Vegas. On April 3, 1989, the wiretap recorded the following phone conversation between Admon and someone named Bob:

Bob: Ooooh. You got his six thousand dollars.

.    .    .    .    .

Admon: Six thousand, twelve thousand.

.    .    .    .    .

Sure did.

.    .    .    .    .

Sure it was mine, fuck. I'm runnin around here goin across country and shit. Hell.

.    .    .    .    .

Fuck, with his motherfuckin dope and money and shit movin back and forth. Hell.

Ex. 264; Tr. vol. X at 152.

On April 6, 1989, co-defendant Serena Nunn drove Admon to the Minneapolis airport where Admon boarded a flight to Los Angeles. When Admon exited the plane in Los Angeles, drug enforcement agents approached her and asked if she had any narcotics or large amounts of money with her. Admon denied carrying narcotics, but stated that she had $2,000 to $3,000 with her. She consented to a search of her purse and luggage, which contained $1,523 in cash. Admon told the agent conducting the search that the money came from her savings and bingo earnings, and that she

intended to give some of it to relatives and use some for shopping in Los Angeles. Admon then consented to a pat search, which disclosed a money belt containing $33,880 in cash. Without being asked, Admon denied that the cash was drug-related. She said that $5,000 came from her grandmother, $12,000 came from a loan, and the remainder represented gifts from gentlemen friends. The Drug Enforcement Agency seized Admon's cash.

On May 4, 1989, police executed a search warrant at Admon's home. In Admon's bedroom, the officers found $500 and a Western Union money transfer receipt for $2,000 from Doris Duke to Ralph Duke. In the kitchen, they found an airline boarding pass in Admon's name from Minneapolis to Los Angeles, a shipping receipt for a package sent from Joseph Duke to Ralph Duke, and assorted drug paraphernalia. A P38 automatic weapon was found under a couch cushion in the basement family room, and a briefcase found in a hot tub contained a 9 millimeter automatic pistol and an empty clip. In Monte Nunn's bedroom, the officers found $18,000 in cash. Following the search, the officers arrested Admon, Serena Nunn, and Samantha Duke.

Admon was indicted on, and pleaded not guilty to, one count charging conspiracy to distribute five kilograms or more of cocaine, and one count charging violation of the Travel Act, 18 U.S.C. § 1952(a). A jury found Admon guilty of both counts. The district court sentenced her to twenty years imprisonment on the conspiracy count and five years imprisonment on the Travel Act count, to be served concurrently, and to eight years of supervised release. Admon appeals.

### DISCUSSION

Admon challenges her convictions as not being supported by sufficient evidence. In reviewing a jury conviction, we must consider the evidence in the light most favorable to the government and must uphold the verdict if a reasonable fact finder could have found guilt beyond a reasonable doubt. *United States v. Ma-*

*rin–Cifuentes,* 866 F.2d 988, 992 (8th Cir. 1989).

### I.

To convict Admon of conspiracy under 21 U.S.C. § 846, the government must prove, by direct or circumstantial evidence, the existence of an agreement among Admon and her co-defendants to achieve an illegal purpose. *See Henderson v. United States,* 815 F.2d 1189, 1191 (8th Cir.1987) (citing *United States v. Grego,* 724 F.2d 701, 704 (8th Cir.1984)). Although Admon need not have had knowledge of all the conspiracy's details, a showing that she knew of the essential object of the conspiracy is required for a conviction. *See id.*

Receipts for money and packages sent to Duke were found in Admon's home and introduced at trial. The evidence at trial also showed that, at Duke's direction, Admon collected $6,000 from Walter Hughes and delivered it to Duke in Las Vegas. Admon described in a phone conversation traveling across the country with $6,000 or $12,000 of "his" money and "his" dope. It was permissible for the jury to infer from all the evidence that "his" referred to Duke. Testimony indicated that Hughes often received cocaine from Duke through intermediaries and made cash payments for the cocaine in the same manner.

Admon later flew to Los Angeles, where Duke owned a home, carrying nearly $34,000 in cash concealed around her waist. On questioning, she lied about the amount of cash she had. Other associates of Duke, including Admon's son, Monte Nunn, had previously been arrested at the Los Angeles airport carrying large amounts of cash which they admitted were the proceeds of cocaine sales. When an agent did find the hidden cash, Admon voluntarily asserted that it was not drug money.

Admon also made numerous sales of cocaine in amounts of one ounce or less during the time her phone was tapped. A search of Admon's home, which she shared with Monte Nunn, one of Duke's major distributors, yielded cocaine packaging paraphernalia. The jury could infer from this evidence that Nunn and Duke were the

sources of the cocaine Admon sold from her home. A reasonable jury could find from all this evidence that Admon knowingly participated in an agreement with Duke, the essential purpose of which was the distribution of cocaine.

## II.

The Travel Act provides as follows:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. § 1952(a) (1988). To establish a Travel Act violation, the government thus must prove that Admon traveled in interstate commerce with intent to distribute the proceeds of cocaine sales, and that she performed or attempted to perform some act in furtherance of the unlawful activity after arriving in Los Angeles. *See United States v. Becton,* 751 F.2d 250, 255 (8th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *see also United States v. Zolicoffer,* 869 F.2d 771, 774 (3d Cir.) (Travel Act violation requires some overt act in furtherance of the unlawful activity subsequent to the travel), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3172, 104 L.Ed.2d 1034 (1989).

■ Admon first contends that the government failed to prove that the money she carried to Los Angeles was the proceeds of unlawful activity. The jury heard wiretap recordings from Admon's phone in which she and Duke discussed her traveling to Las Vegas to deliver money from Hughes, one of Duke's cocaine customers, to Duke. Admon described in another phone conversation traveling across country with money and drugs. Evidence of past criminal plans or acts is relevant to and probative of the unlawful activity element of a Travel Act violation. *See United States v. Spector,* 793 F.2d 932, 936 (8th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

■ As noted above, other associates of Duke had been arrested at the Los Angeles airport carrying large sums of cash. Scott Treadwell testified that $11,000 in cash seized from him at the Los Angeles airport in January 1989 was the proceeds of cocaine sales. He stated that Marcel Duke, Duke's nephew, had instructed him to use the money to purchase a kilogram of cocaine in Los Angeles. In December 1988, Monte Nunn, the son of Admon and Duke, was arrested in the Los Angeles airport following a flight from Minneapolis carrying $22,000 in cash. George Woessner, a Drug Enforcement Agency agent from Los Angeles, testified that although Nunn first claimed that the money belonged to his brother and represented gambling winnings from Las Vegas, Nunn later admitted that it was drug money. It was permissible for the jury to consider this evidence relating to other charged offenses because it was also relevant to the Travel Act count. *See United States v. Hoelscher,* 764 F.2d 491, 494 (8th Cir.1985).

■ The wiretap evidence, standing alone, might not be sufficient to support a conclusion that the $33,880 found on Admon in Los Angeles was the proceeds of cocaine sales. Similarly, the admissions by Duke's other associates that they carried drug money to Los Angeles would not, by themselves, compel the conclusion that Admon was acting as a drug money courier when she was apprehended. When viewed in the light most favorable to the verdict, however, and considered as a whole, the above evidence is sufficient to support the jury's conclusion that the $33,880 Admon transported from Minneapolis to Los Angeles was the proceeds of unlawful activity.

■ Admon also contends that the government made no showing of an attempt by her to distribute the money after she arrived in Los Angeles. We believe this argument misreads the Travel Act. The overt act requirement can be satisfied by the performance or attempted performance of *any* of the acts specified in 18 U.S.C. § 1952(a)(1), (2), or (3). The government therefore was not required to show an attempt by Admon actually to distribute the money; any act tending to carry on or to facilitate the carrying on of the unlawful activity, done after the interstate travel is completed, satisfies the overt act requirement. 18 U.S.C. § 1952(a) (1988); *see Zolicoffer,* 869 F.2d at 775 (although government must show "some conduct after the travel in furtherance of the unlawful activity," such conduct need not itself be unlawful); *United States v. Brown,* 770 F.2d 768, 772 (9th Cir.), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985) (unlawful activity need not be completed for Travel Act violation to be upheld); *Becton,* 751 F.2d at 255 (government must prove that "some act in furtherance of" illegal activity occurred after interstate travel).

The evidence at trial showed that Admon left the plane in Los Angeles with $1,523 in her purse and luggage and $33,880 concealed in a money belt around her waist. When questioned by police officers, Admon stated that she had $2,000 to $3,000 in cash with her, and consented to a search of her purse and luggage. She failed to disclose the $33,880 which she had around her waist under her clothing. It was permissible for the jury to infer that Admon's failure to reveal the $33,880 was an attempt by her to prevent its discovery by the police and to enable her to deliver the cash to its destination in Los Angeles. Admon's act of lying about the amount of cash she carried thus satisfies the requirement of an overt act in furtherance of unlawful activity. *See Zolicoffer,* 869 F.2d at 775 ("nothing contained herein is intended to suggest that the required overt act cannot be committed in an airport").

CONCLUSION

For the foregoing reasons, we find that sufficient evidence supports the jury's verdicts of guilty on the conspiracy and Travel Act counts. Accordingly, we affirm the judgment of the district court.